**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**MARC SCOTT SILVERBERG**                                                     **PLAINTIFF**


**VERSUS**                                                     **NO. 2:09cv119-P-S**


**BOYD TUNICA, INC., D/B/A**
**SAM'S TOWN HOTEL & GAMBLING HALL**                         **DEFENDANT**
_____

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

## FACTS

Marc Silverberg has had an illustrious career in the Food and Beverage Industry. (Exhibit

"A," Marc Silverberg Resume) Silverberg is a Certified Executive Chef, and a graduate of the

Culinary Institute of America, the most prestigious school for chefs in the country. (*Id*., Exhibit "B,"

Letter from the American Culinary Federation) Silverberg has worked his way up the ranks in the

Food and Beverage Industry: 1) From 1980-1993, Chef at the Tropicana Hotel and Casino in

Atlantic City, to Executive Chef at the Holiday Inn/Harrah's University in Olive Branch,

Mississippi; 2) From 1994-2003, Executive Chef to Vice President of Food and Beverage at

Hollywood Hotel and Casino, Robinsonville, Mississippi ; then Director of Food and Beverage at

San Manuel Casino in Highland, California. (*Id*.)

In May 2006, Marc Silverberg, went to work for Defendant Boyd Tunica, Inc., dba Sam's

Town Hotel and Gambling Hall (Sam's Town") as the Director of Food and Beverage. (Deposition

of Marc Silverberg, p. 13, Exhibit "C") Brett Borek, Assistant General Manager, was Silverberg's

1

direct supervisor from the day he was hired until early 2008, when George Stadler became Silverberg's direct report. (*Id.*) Silverberg supervised approximately 275 employees and oversaw six different venues: the buffet, the steakhouse, Smokey Joe's Café, Snacks and Stuff Snack Bar, the banquet facility, and the employee cafeteria. (*Id.*, p. 111)

Marc Silverberg is Jewish. (Silverberg depo., p. 24) Silverberg was the only employee at the director level working for Sam's Town who was Jewish. (*Id.*, p. 25) There were two other employees in the food and beverage department who were Jewish – Alan Handler, who was the restaurant operations manager; and Bill Glass, who was the manager of Twain's Steakhouse. (*Id.*) To the best of his knowledge, the only other Jewish employee at Sam's Town was Michael Swartz. (Deposition of Michael Swartz, p. 6, Exhibit "D") Sam's Town employs around 1000 employees. (Deposition of Betty Ferguson, p. 14, Exhibit "E")

Silverberg received his performance appraisal for 2006, with all of his scores either "meeting expectations," or "exceeding expectations." (Exhibit "F," Silverberg Evaluation for 2006)

The remarks made his supervisor, Brett Borek, included:

1.    OVERALL MANAGEMENT SKILLS COMMENTS - Marc's contribution to the success of the F&B department in 2006 was felt immediately upon his joining the team. His experience in the Tunica market allowed for a quick and smooth transition into the role of director. Marc was able to bring the staffing levels up to par very quickly. That talent and diversification he brought to the sous chef ranks has allowed us to provide a better and more consistent food product to the customer.

2. OVERALL GUEST SATISFACTION QUOTIENT - Marc has spent time bringing the main kitchen to higher level of cleanliness. Due to the market challenges of hiring qualified kitchen personnel, Marc was involved in contracting an outside company to provide stewarding services on grave shift. This has allowed us to maintain a consistent level of cleanliness and staffing levels in order to provide better guest service. Our overall food and beverage offerings have continued to improve throughout the year as reported by our NBRI scores.

2

3. PLANNING, PREPARATION AND EXPENSE MANAGEMENT - Marc has brought a renewed energy to the food & beverage department. He has brought new ideas into the department that we will be able to implement in order to provide a better guest experience. We have, and will be, implementing enhanced menu offerings and service levels to our customers in order to provide for a greater guest experience. He has shown that he is keenly aware of food and labor costs and strives to operate within established guidelines without diminishing the customer experience. He is constantly looking to provide unique enhancement within our food offerings in order to make us more competitive.

4. OVERALL PERSONAL SKILLS COMMENTS - Marc is aware of the impact his visibility within his department affects employees at all level. He has been able to communicate to all levels within his departments his concern for their well being and understands the impact this has on the customer experience. He shows a genuine concern for the employees within his department, as well as throughout the property.

5. OVERALL COMMENTS - Marc has been a great addition to the team. His previous experience in the Tunica market has been an asset for the property in dealing with the employee base, vendors, as well as understanding the customer wants and desires. He has brought a fresh perspective to the food and beverage departments and will contribute to the ongoing success and greater customer experience throughout the property.

(*Id.*)

Because of his excellent evaluation, Silverberg received a three percent raise in January 2007. (Exhibit "G," Personnel Change Form dated January 12, 2007)

For 2007, Silverberg received all but one "meets expectations," or higher in his annual review, and the review contained the same excellent comments about his work. (Exhibit "H," Silverberg Evaluation for 2007) However, Silverberg never received the evaluation because, as Borek told Silverberg, "George, will not sign your [evaluation], . . . he has to sign off on it. I cannot give it to you." (Silverberg depo., pp. 102-03)

Truth is, George Stadler had a problem with Jewish people, and other minorities. George Stadler was very vocal about his German/Irish heritage, and often talked about being Catholic and

3

his missionary work. (Exhibit "I," Plaintiff's Responses to Interrogatories, No. 4, p. 2)

Twice during OPCO meetings, Stadler would look at Silverberg and say, "As Allah . . . you know what that means . . . It comes from your part of the world." (Silverberg depo., pp. 20-21)

On one occasion, Stadler made a comment to Silverberg that a casino in the midwest had opened, and "they hired all of your kind." (Silverberg depo., pp. 26-28) When Stadler said "your kind," he emphasized that phrase. (*Id.*) Stadler then proceeded to rattle off Jewish heritage sounding names, in a condescending tone. (*Id.*)

In November 2007, Silverberg reported to his direct supervisor, Brett Borek, that he was uncomfortable, appalled and upset with George Stadler's insistence that "everyone celebrate Christmas," and it should be called a "Christmas Party." (Silverberg depo., pp. 12, 14, 16, 24) Further, Stadler asked Silverberg on two different occasions whether he would be Santa Claus at the "Christmas" party. (*Id.*, p. 16) Brett Borek was also appalled and upset at Sadler's lack of religious tolerance as well. (*Id.*, pp. 14, 17)

Stadler told Silverberg, "You're the only Jewish guy I know who doesn't celebrate Christmas, and I have a lot of Jewish friends." (Silverberg depo., p. 16) Silverberg refused to be Santa Claus at the "Christmas" party, and did not even attend. (*Id.*, p. 18) In previous years it had been called a "holiday" party. (*Id.*)

On or about June 18 or 19, 2008, Stadler was at the lunch table in the Great Buffet with George Stadler, Brett Borek, and Mark McCrindle. George was talking about the illiteracy rate and lack of work ethic regarding certain employees at Sam's Town. (Plaintiff's Responses to Interrogatories, No. 4( f), p. 4) Stadler referred to the workers as "Fucking Niggers," and said, "you can't teach them anything." (Id.) Everyone at the table was speechless. (Silverberg depo., p. 29)

4

On or about June 20, 2008, Silverberg was in George Stadler's office having a one-on-one meeting, and Stadler proceeded to lecture Silverberg about coming from Philadelphia, and he should know how to handle "Dago's." (Plaintiff's Responses to Interrogatories, No. 4( g), p. 4) Stadler said, "you take them and hold them to the wall with your thumb on their throat and slap the shit out of them . . .." (*Id.*)

On another occasion, Stadler asked Silverberg, "what if you were on vacation and this guy comes to me and says, "I don't like fat Jewish people, should I then fire you?" (Plaintiff's Responses to Interrogatories, No. 4( h), p. 5)

On June 28, 2008, George Stadler was talking about the Max Schmelling and Joe Louis fight, from the early part of the 20th century. (Plaintiff's Responses to Interrogatories, No. 4( i), pp. 5-6) Stadler explained in detail how Max Schmelling was the pride of Germany, Hitler and the Aryan Race, and how they were going to make a statement to the United States. (*Id.*) As it turned out, Joe Louis won and sent Max home in disgrace. (*Id.*) Stadler stated that the Pepsi Corporation awarded Schmelling the rights to distribute their product throughout Germany, and so, ultimately he was the true winner, because he became very wealthy from the distribution of Pepsi in his home country. (*Id.*) This story demonstrated Stadler's reverence for Hitler and the Aryan race and his lack of regard for the Jewish race. (*Id.*)

On several occasions, Silverberg discussed the Jewish comments made by Stadler to Brett Borek, his immediate supervisor. (Silverberg depo., p. 82) Borek never did anything about the discrimination or reported it to corporate.

Jean Whitten was the wardrobe supervisor/manager for Sam's Town until January 2009,

when her job was eliminated.  (Deposition of Jean Whitten, Exhibit "J," p. 6)[1]  According to

Whitten, George Stadler was out to fire Silverberg:

> On this particular day [Betty Ferguson] called me to her office and said, "This is
> between me and you," which she always said.  "We got to get rid of Marc
> Silverberg."  I went, "What?  Why?"  "George does not like him.  He does not fit in
> here.  I need you to find out any scoop you can find out on Marc Silverberg.  Have
> you heard anybody talking about him?"  And I said, "No, everybody seems to like
> him."

(Whitten depo., p. 8)

This conversation with Betty Ferguson happened around a month or month and a half before

Silverberg was fired.  (Whitten depo., p.14)  During that same conversation, Ferguson told Whitten,

"George said he had to get rid of the Jews on the boat."  (Id., p. 15)

Angela Skinner is Human Resources Director at Sam's Town.  (Deposition of Angela

Skinner, p. 4, Exhibit "K")  Angela Skinner, who was Betty Ferguson's and Kimyatta Randall's

boss, told Randall that if there was anything going on in Silverberg's department to email him and

cc her and George Stadler.  (Deposition of Kimyatta Randall, pp. 8-9, Exhibit "L")  In short, they

were trying to find things that were wrong with Silverberg's department.  (*Id.*, p. 9)  They were not

trying to find things that were wrong in any other departments at Sam's Town which were run by

non-Jewish persons.  (*Id.*)

On another occasion, at employee appreciation day, George Stadler blurted out to Jean

Whitten, "You know, there ain't nothing down here but Jews and Dagos."[2]  (Whitten depo., p.9)

Stadler would refer to the Italians working in upper management in Las Vegas as the "the good ol'

---

[1]Deposition excerpts of Jean Whitten, Exhibit "J," are being submitted to the Court under seal for purposes
of confidentiality.

[2]Dago is a derogatory name for an Italian.  (Jean Whitten depo., p. 9)

Dago boys." (*Id.*, p. 9)  On other occasions, Whitten would hear Stadler refer to the "Damn Jews" in referring to Silverberg and Alan Handler.  (*Id.*, pp. 11-12)  Stadler would also refer to Silverberg or Handler as a "damn stupid Jew."  (Id., pp. 12, 24)   Stadler would also refer to Silverberg as a "God damn Jewish slug."  (*Id.*)

Most of the employees in the kitchens were black, and George Stadler would call his black workers  by the N-word, as Whitten explained, "If we didn't have all the d-a-m-n [Niggers] we might have things going smoother."  (Jean Whitten depo., p. 10)  Whitten heard Stadler use the N-word around three times at work.  (*Id.*)  "Damn Niggers.  If we could get rid of the stupid damn niggers in the kitchen."  (*Id.*, p. 18)   If anything would come up missing from the warehouse or whatever, Stadler would say, the damn niggers took it.  (*Id.*, p. 19)

On July 29, 2008, Silverberg was placed on a performance improvement plan ("PIP") by George Stadler.  (Silverberg depo., p. 65; Exhibit "M," Job Performance Improvement Plan) Because he did not have a chance to review the PIP, Silverberg initially declined to sign it. (Silverberg depo., p. 66)  However, after Stadler stated that this would be an indication that he was not willing to improve, Silverberg reluctantly signed the PIP.  (*Id.*)

At the time Silverberg was put on the PIP, he had been employed at Sam's Town for over two years and had never been written up, nor had anyone indicated that his job was in jeopardy for poor performance.  (Silverberg depo., p. 118; Skinner depo., p. 11)   In fact, no one had indicated that they were unhappy with his performance, except of course, George Stadler.  (Silverberg depo., pp. 118-19)

On August 7, 2008, approximately one week later, Silverberg reported the progress he had already made in the PIP to Stadler and Angela Skinner.  (Exhibit "N," Response to PIP, dated

August 7, 2008)  Even though he was supposed to meet weekly with Stadler, after that, Silverberg ended up only meeting weekly with Angela Skinner.  (Silverberg depo., p. 69)    According to Silverberg, at the one meeting that was had, Stadler acted like he was very upset with Silverberg and acted like he was irritated and "raised his voice and even became confrontational and argumentative with me about it."  (*Id.*, p. 70)  Silverberg did not take the PIP lightly, because he was trying to save his job.  (*Id.*, p. 74)

On August 15, 2008, Silverberg sent his second response to the PIP.  (Exhibit "O," Second Response to PIP, dated August 15, 2008)

In an apparent response to Silverberg's report of his progress on his PIP, dated August 15, 2008, it said, "It has come through the grapevine that Marc is trying to build a case that George has made comments about his Jewish heritage, this was told to someone outside the property."  (Exhibit "P," Letter with Heading: Marc Silverberg, 8/15/08, Page Four)  Thus, it is undisputed that Defendant was aware of Silverberg's claim of discrimination prior to his termination.

On August 22, 2008, notwithstanding the constant progress, George Stadler called Silverberg into his office and said, "I'm going to expedite the performance improvement plan and terminate you as of today."  (Silverberg depo., p. 79; Exhibit "Q," Separation Document Form)  As indicated in the taped meeting, George Stadler stated, "Marc, I have made the decision to terminate you effective today."  (Exhibit "R," Meeting with Marc Silverberg dated 8/22/08)  Defendant's attempt to claim that the decision was made by Angela Skinner, corporate, and George Stadler, is disingenuous at best.

On or about August 29, 2008, a week after he was terminated, Silverberg sent a letter to Bill Noone, Senior Vice President for Boyd Gaming, located in Las Vegas, Nevada, stating, in part,

8

> George on many occasions has made quite a few Anti-Semitic remarks towards me both in public, such as in the OPCO meetings and in private. I brought this to the attention of the Assistant General Manager on a few occasions that I felt threatened and I considered it to be a hostile work environment.
> . . .
> I am stating that I perceive that a large part of my termination for 'just cause' was because of my Jewish Religion and heritage and beliefs and not because of my performance.

(Exhibit "S," Letter to Bill Noone)

After Silverberg was illegally terminated, he was replaced by Michael Pastore, who is Catholic. (Marc Silverberg depo., p. 57; Deposition of Michael Pastore, p. 5, Exhibit "T")

On March 9, 2010, Kimyatta Randall, Human Resources Manager at Sam's Town, was deposed in this matter. (Kimyatta Randall depo., pp. 1, 7) Randall testified that she was terminated because she had knowledge about some things that were said about Marc Silverberg and she was not going to lie for the company. (*Id.*, pp. 5-7) Angela Skinner, her direct supervisor, told her that she could never repeat certain things. (Id.) One of the things that Skinner told Randall she could not repeat was hearing George Stadler refer to Silverberg as a "Goddamn Jewish slug." (*Id.*) Randall told Skinner, "I can't sit down truthfully and do a deposition or talk with them without telling what I know . . .." (*Id.*, p. 23) Around two weeks later, Randall was suspended, and then later fired. (*Id.*, p. 24)

During the two-and-a-half years that Randall worked as a human resources manager, Randall handled all of the EEOC responses for Sam's Town, except for Marc Silverberg's, (Randall depo., pp. 21-22), the reason being that she could not "answer that EEOC to benefit the company" because she knew that Stadler was an Anti-Semite. (*Id.*)

Michael Swartz, casino host at Sam's Town, is another Jewish employee. (Swartz depo., pp. 4, 6) Stadler was not the only Anti-Semite working at Sam's Town. Larry Spencer, who was

Swartz' director, stated on several occasions that he was like Adolph Hitler. (*Id.*, pp. 8-9) Spencer stated, "the Jews, . . . were the worst criminals of all." (*Id.*)

Swartz also testified that George Stadler, on several occasions, looked into his face and stated, "I'm a German. I just want you to know that." (Swartz depo., p. 17) Stadler would do this in front of other people, so Swartz took this as Stadler "trying to get a message across." (*Id.*, p. 19) Stadler would walk up to Swartz out of the blue and tell him things like, "I just want to let you know I saw Shindler's List." (*Id.*, p. 20) On another occasion Stadler told Swartz, "I saw The Boy in the Striped Pajamas." (*Id.*) Both are films in which the major theme is the Jewish Holocaust. (*Id.*, p. 21)

Defendant has now filed its Motion for Summary Judgment [Dockets 44 & 45]. Plaintiff will show that the motion is not well taken and should be denied.

## **STANDARD OF REVIEW**

"[S]ummary judgment is an extreme and drastic measure which courts should use sparingly and only in the clearest of cases." *Printy v. Crochet & Borel Services*, 196 F.R.D. 46, 50 (E.D. Tex. 2000). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996) (quoting Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the non-movant's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980). See also,

*Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989); *Runnells v. Armstrong World Industries, Inc.*, 105 F.Supp.2d 914, 918 (C.D. IL 2000).

In ruling on a motion for summary judgment, the Court is not to make credibility determinations, weigh evidence, draw inferences from the facts, or draw from the facts, legitimate inferences for the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255.

The United States Supreme Court reversed the Fifth Circuit's setting aside of a jury verdict in an employment discrimination case in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). In *Reeves*, the Fifth Circuit Court of Appeals had applied the *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*) test in rejecting a jury verdict. The Supreme Court overturned the Fifth Circuit, holding:

> In concluding that these circumstances (defendant's impressive evidence of non-discrimination) so overwhelmed the evidence favoring petitioner that no rational trier of fact could have found that petitioner was fired because of his age, the court of appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury.

*Reeves, supra*, at 153.

Juries play a paramount role in employment cases and in evaluating summary judgment evidence. This Court should not engage in credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts, which are jury functions, not those of a judge. *Reeves*, 530 U.S. at 133.

In *Valle v. Johnson Controls World Services, Inc.*, 957 F.Supp. 1404, 1414 (S.D. Miss. 1996), the Fifth Circuit held, "Because Title VII complaints generally involve complex and disputed

11

facts, summary judgment is often an inappropriate method of adjudicating such claims." Further, the Fifth Circuit has held:

> In reviewing a motion for summary judgment, the court must indulge every reasonable inference from the underlying facts in favor of the party opposing the motion. The party who defended against the motion for summary judgment must have his allegations taken as true and must receive the benefit of the doubt when his assertions conflict with those of the movant. In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent. Often, motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the fact finder.

*Thornbrough v. Columbus and Greenville Railroad Co.*, 760 F.2d 633, 640-41 (5th Cir. 1985). See also, *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150 (7th Cir. 1994); *Batey v. Stone*, 24 F.3d 1330 (11th Cir. 1994).

"Trial courts must be particularly cautious about granting summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Peralta v. Cendant Corp.*, 123 F.Supp.2d 65, 75 (D. Conn. 2000) (*citing Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 87 (2nd Cir. 1996)). Where the facts are such that two inferences may be drawn, a factual issue for the jury is presented. *Hunt v. Cromartie*, 526 U.S. 541 (1999). "At the summary judgment stage, the nonmovant need only point to the existence of a genuine issue of material fact." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

Finally, "a motion for summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Gibson v. Henderson*, 129 F.Supp.2d 890 (M.D. N.C. 2001).

Defendant cannot meet that test and summary judgment would be improper.

## ARGUMENTS AND AUTHORITIES

### I.    RACE AND RELIGIOUS  HARASSMENT

As an initial matter, the discovery deadline was July 26, 2010.  [Docket 12]  On March 24, 2010, Defendant supplemented its Core Disclosures, identifying Barbara Bolender as a person who might have discoverable knowledge.  [Docket 24]  Defendant has now attached to its motion a self-serving affidavit from Bolender, dated August 17, 2010, almost a month after the discovery deadline.  (See Exhibit D, attached to Defendant's Motion)  For that reason, the affidavit should be stricken and not considered by this Court.  Further, this alleged investigation of Silverberg was not an investigation of him at all, but instead, of the Chef.  The email provided by Defendant says in the last entry:  "Marc has been diligent in checking with the employees and asking if all is going well.  There have been no issues brought to HR or management concerning this issue." (See Exhibit  C, attached to Defendant's Motion)

A plaintiff may establish a Title VII violation based on religious or race discrimination creating a hostile work environment."  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  Further:

> In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.*  (Citing *Walker v. Thompson*, 214 F.3d 615, 525 (5th Cir. 2000)).

In order to survive summary judgment on a hostile working environment claim, the Plaintiff must produce evidence that would create a genuine issue of material fact for each of the following elements:

(1)     he belongs to a protected group;
(2)     he was subjected to unwelcome harassment;
(3)     the harassment complained of was based on race and/or national origin;
(4)     the harassment complained of affected a term, condition, or privilege of employment;
(5)     the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Id.* (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001); *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986)).

Defendant makes much about the fact that Silverberg answered in discovery, and his deposition, that being Jewish is a religion, not a race. This of course is true. In reality, being Jewish is a religion, being Hebrew is a race, and being Israeli is a nationality. However, when Anti-Semites spew their venom about Jewish people, they treat Jewish people as a race, religion and nationality, or more correctly, as a person of a certain ancestry and heritage. The United States Supreme Court has been clear that harassment against a "Jewish" person can be considered discrimination because of race and religion:

In *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 615, 107 S.Ct. 2019, 2021 (1987), the United States Supreme Court held:

Jews can state a § 1982 claim of racial discrimination since they were among the peoples considered to be distinct races and hence within the protection of the statute at the time it was passed. They are not foreclosed from stating a cause of action simply because the defendants are also part of what today is considered the Caucasian race.

In *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028 (1987), the Supreme Court held:

Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic

14

characteristics. Such discrimination is racial discrimination that Congress intended
§ 1981 to forbid, whether or not it would be classified as racial in terms of modern
scientific theory. The Court of Appeals was thus quite right in holding that § 1981,
"at a minimum," reaches discrimination against an individual "because he or she is
genetically part of an ethnically and physiognomically distinctive sub-grouping of
*homo sapiens.*" It is clear from our holding, however, that a distinctive physiognomy
is not essential to qualify for § 1981 protection. If respondent on remand can prove
that he was subjected to intentional discrimination based on the fact that he was born
an Arab, rather than solely on the place or nation of his origin, or his religion, he will
have made out a case under § 1981.

Even though calling Jewish just a religion is technically correct, Jewish is the term that Anti-Semites use to describe persons of Silverberg's ancestry, religious and ethnic characteristics. As such, being harassed or discriminated against because one is Jewish is actionable under both Title VII and § 1981.

### A. Protected Group

Marc Silverberg is Jewish, which is a protected class under Title VII and §1981.

### B. Unwelcome Harassment

Actionable harassment involves racially-discriminatory intimidation, ridicule and insults. *Felton v. Polles*, 2002 WL 31819894, *14 (5th Cir. 2002). In this case, Stadler would constantly refer to Silverberg's Jewish race and religion in derogatory terms. He tried to get him to be Santa Claus at a Christmas party, when in previous years it was called a "holiday" party. He referred to people with Jewish sounding names as "your people." He referred to the Middle East as "your part of the world." He discussed, with reverence, Hitler, the Nazis and the Aryan race. Silverberg did nothing to solicit this harassment.

### C. Harassment Was Race/Religious

Stadler made it clear that he did not like Jewish people.

### D. Affected Term, Condition, or Privilege of Employment

15

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The United States Supreme Court has interpreted the statute as follows:

> As we made clear in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Title VII is violated.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) (citations omitted). The *Harris* Court further held that there is an objective and subjective aspect to the analysis, stating that it must be one that a reasonable person would find hostile or abusive, and the victim must subjectively perceive the environment to be abusive. *Id.* at 21.

Finally, the Supreme Court went on to state:

> But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Id.* at 22.

In this case, the harassment was so severe that on numerous occasions, Silverberg reported the harassment to his direct supervisor, Brett Borek. Brett Borek, who witnessed Stadler's racism

16

himself, never did anything about the harassment.

**E.    Employer Knew or Should Have Known and Failed to take Prompt Remedial Action.**

An employer has actual knowledge of harassment that is known to "higher management" or to someone who has the power to take action to remedy the problem. *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999). "The "management" and "remedial power" standards blur together, however, when we examine who may be considered "management," for to be considered a "manager," a person must have the ability to exert control over employees. *Id.* "This includes someone with the power not only to hire and fire the offending employee but also to take disciplinary action, to provide significant input into employment decisions, to instruct the offending employee to cease the harassing behavior, or to implement other means of taking remedial action." *Id.*

In this case, Silverberg reported the harassment to his supervisor, Brett Borek, who was the Assistant General Manager for Sam's Town. The person committing the harassment was the General Manager, George Stadler. Borek never reported the harassment to corporate.

Plaintiff can make a *prima facie* case of harassment. As such, summary judgment would be improper on his claim of race and religious harassment and Defendant's motion should be denied.

## II.    RACE DISCRIMINATION

Title VII and Section 1981 claims may be proven with either direct or circumstantial evidence. *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192-92 (5th Cir. 2001). When the Plaintiff presents direct evidence of intentional discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861

(5th Cir. 1993).

In this case, there is direct evidence of race and religious discrimination. Jean Whitten was the wardrobe supervisor/manager for Sam's Town until January 2009. According to Whitten, George Stadler was out to fire Silverberg:

> On this particular day [Betty Ferguson] called me to her office and said, "This is between me and you," which she always said. "We got to get rid of Marc Silverberg." I went, "What? Why?" "George does not like him. He does not fit in here. I need you to find out any scoop you can find out on Marc Silverberg. Have you heard anybody talking about him?" And I said, "No, everybody seems to like him."

(Jean Whitten depo., p. 8)

This conversation with Betty Ferguson happened around a month or month and a half before Silverberg was fired. During that same conversation, Ferguson told Whitten, "George said he had to get rid of the Jews on the boat."[3] (*Id.*, p. 15)

Having to get rid of the "Jews" on the boat qualifies as direct evidence of discrimination.

More commonly, however, Plaintiffs lack any sort of "smoking gun" evidence of discrimination, and must resort to proving their case circumstantially through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

In order to make a circumstantial *prima facie* case of unlawful discrimination, Silverberg need only introduce evidence that:

(1)    he is a member of a protected class;

(2)    he was qualified for the position;

(3)    he suffered an adverse employment decision;

---

[3]George Stadler and Betty Ferguson were both managerial employees of the Defendant, thus it is not hearsay, but an admission by a party opponent. FRE 801(d)(2).

(4)     he was replaced by someone of another race or religion, or, treated less favorably than a similarly situated person of a different race or religion.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *St. Mary's Honor Center. v. Hicks*, 509 U.S. 502, 509 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223-24 (5th Cir. 2000); *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674 (5th Cir. 2001).

"To establish a *prima facie* case, [the plaintiff] need only make a very minimal showing." *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

### A.     PRIMA FACIE

#### 1.     Protected Class

Marc Silverberg is Jewish, which is a protected race and religion, according to the United States Supreme Court.

#### 2.     Qualified

Plaintiff received excellent reviews in 2006 and 2007.  Until the time he was put on a PIP, only three weeks before he was terminated, he had never been written-up and no one had indicated to him that he was in danger of being terminated.

#### 3.     Adverse Employment Decision

On August 22, 2008, Marc Silverberg was fired.

#### *4.   Replaced by Someone of a Different Race.*

After being terminated, Silverberg was replaced by Michael Pastore, who is not Jewish, and is Catholic.

Clearly, Plaintiff can make a *prima facie* case of race and/or religious discrimination. Regardless, Defendant has conceded that Plaintiff can make a *prima facie* case.

### B.   LEGITIMATE NON-DISCRIMINATORY REASON

Once a Plaintiff has made his *prima facie* case, the burden of production shifts to the Defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment decision.  *Nowlin v. Resolution Trust Corporation*, 33 F.3d 498, 507 (5th Cir. 1994).  Once a plaintiff has produced evidence of these elements of his *prima facie* case, the burden of production then shifts to the Defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."  *U. S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).

Defendant claims that it terminated Plaintiff because of poor job performance, satisfying its production burden.

### C.   PRETEXT

In the third step in this burden-shifting framework, Plaintiff must produce some evidence that the proffered reason is probably false or may not be the real reason.  If the Plaintiff does so, he has created a jury question which would make summary judgment improper.

The United States Supreme Court has held:

The defendant's "production" (whatever its persuasive effect) having been made, the **trier of fact** proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]" because of his race. The **factfinder's disbelief** of the reasons put forward by the defendant (particularly

20

if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, **rejection of the defendant's proffered reasons will *permit* the trier of fact** to infer the ultimate fact of intentional discrimination . . . upon such rejection, no additional proof of discrimination is *required.*

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis added and citations omitted).

In *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711 (1983), the late Chief Justice Rehnquist aptly stated why summary judgment should rarely be granted in discrimination cases once the plaintiff has made a minimal showing of his *prima facie* case and has put forth some evidence that the proffered legitimate, non-discriminatory reason is pretext:

All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be "eyewitness" testimony as to the employer's mental processes." "The law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago:

The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." *Eddington v. Fitzmaurice,* 29 Ch.Div. 459, 483 (1885).

*U.S. Postal Service Bd. of Governors,* 460 U.S. at 716-17.

Defendant claims that it fired Silverberg for poor job performance. However, it is undisputed that Plaintiff received excellent reviews for 2006 and 2007. Until the time he was put on a PIP, only three weeks before he was terminated, he had never been written-up and no one had indicated to him that he was in danger of being terminated. Silverberg was the only Jewish director, the only director that was placed on a PIP, and the only director that Stadler had HR try to "find some dirt on," so it could place him on a PIP.

21

Defendant has now produced an untimely, self-serving affidavit from Brenda Bolender claiming that she had recommended placing Silverberg on a PIP prior to Stadler doing so. Besides being untimely, it is also uncorroborated. What is clear is that Stadler had a problem with Jewish persons. Stadler constantly ridiculed and harassed Silverberg because he was Jewish. Stadler asked Betty Ferguson and Kimyatta Randall from HR to find some dirt on him, because he wanted to get of him. He told Ferguson that he had to get of the "Jews on the boat."

Stadler placed Silverberg on a thirty-day PIP, and fired him before the thirty days had expired.

In sum, Plaintiff can make a *prima facie* case of race and religious discrimination and has produced sufficient evidence to rebut Defendant's proffered reason for his termination, making summary judgment improper.

### D. MIXED MOTIVE

In the alternative, Plaintiff can survive summary judgment by showing that his Jewish race and religion was a motivating factor in his termination, even if other factors were present.

On June 9, 2003, the United States Supreme Court handed down *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). In a unanimous decision, Justice Thomas, writing for the Supreme Court, held that a "plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Id.* at 101. Since *Desert Palace*, the other circuits have been forced to change the standards for Title VII cases. *See, Rowland v. American General Finance, Inc.*, 340 F.3d 187, 194 (4th Cir. 2003) (vacating jury verdict because plaintiff not given a mixed-motive instruction); *White v. Burlington Northern & Santa Fe R.. Co.*, 364 F.3d 789, 811

(6th Cir. 2004) (noting that Supreme Court in *Desert Palace* has cautioned courts against unwarranted limitations or otherwise unambiguous statutory text); *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061 (9th Cir. 2003).

On June 25, 2004, the Fifth Circuit indicated that it was in line with the United States Supreme Court and no longer distinguished circumstantial from direct evidence in regard to Title VII cases. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 311 (5th Cir. 2004). In *Rachid*, the Fifth Circuit held that a plaintiff can satisfy the third prong of the burden-shifting analysis either by showing pretext or by showing that the protected characteristic was a motivating factor:

> Our holding today that the mixed-motives analysis used in Title VII cases post-*Desert Palace* is equally applicable in ADEA represents a merging of the *McDonnell Douglas* and *Price Waterhouse* approaches. Under this integrated approach, called, for simplicity, the modified *McDonnell Douglas* approach: the plaintiff must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"

*Rachid,* at 312.

The Fifth Circuit is employing this modified *McDonnell Douglas* approach as first articulated in *Rachid*. See *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005).

A reasonable jury could conclude that being Jewish was a motivating factor in Silverberg's termination, even if other factors are involved, and summary judgment would be improper.

## E.   STRAY REMARKS

Defendant claims that the various discriminatory remarks made by Stadler fail to serve as

23

evidence of discrimination. Defendant is incorrect.

The Fifth Circuit has found that the "stray remarks" doctrine only applied where the plaintiff had not produced sufficient evidence of pretext. *Rubenstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000). The Fifth Circuit reversed a district court for excluding age-related remarks from evidence, and cited Federal Rule of Evidence 401 for the proposition that the standard of relevance is a liberal one. The court ruled that such statements were "obviously relevant" to show bias on the part of a key figure in the decision to fire the employee." *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994).

The *Manville* court also brushed aside the defendant's argument related to whether or not remarks had to be "contemporaneous," and stated that even if remarks are "remote in time," and were not made by those necessarily with hiring/firing authority, all that means is that these remarks "are, alone, insufficient to establish age discrimination." *Id*. at 1093, n.2. Even where a long period of time elapses from the moment a remark was made until the moment when the adverse decision was made, this time span does not suggest that the remark is irrelevant. *Id*. at 1094.

In *Manville*, *supra*, the court anticipated the landmark Supreme Court decision of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (5th Cir. 2000), in holding that exclusion of the evidence as "stray remarks" as a matter of law was improper usurpation by the trial court in the role of the fact-finder. *Manville*, 27 F.3d at 1093. According to the Court, "they [the discriminatory statements] are obviously relevant to a showing of age bias on the part of a key figure in the decision to terminate [the employee] and, as such, are admissible." *Id.*

In *Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000), decided after *Reeves,* the Fifth Circuit took the *Manville* Court's decision one step farther. The court stated that "in light

24

of the Supreme Court's admonition in *Reeves*, our pre-*Reeves* jurisprudence regarding so-called 'stray remarks' must be viewed cautiously." *Id*. at 221. The plaintiff alleged that the decision-maker repeatedly referred to her as an "old bitch." The court determined that it would be a reasonable inference for the jury to make, that repeated use of that term could indicate discriminatory motives. *Id*. at 226. The Fifth Circuit held that the evidence of the decision-maker's discriminatory remarks, coupled with the plaintiff's *prima facie* case and additional evidence of age-based motive, was sufficient to sustain a verdict for the plaintiff. The *McKinney* court concluded that discriminatory comments could be found by a jury to demonstrate discriminatory animus, even if the remarks were "not in the direct context of the decision. . ." *Id*. at 229.

*Reeves* stands for the proposition that it is up to the jury to determine whether or not such remarks have probative value, irrespective of when those remarks were made in relation to the challenged employment decisions. If other evidence of discrimination is presented, these remarks should be considered along with the other evidence. Thus, it would appear that such remarks, even the "stray ones," should be admissible unless good cause exists to exclude them under Rule 403 of the Federal Rules of Evidence. Even if these remarks were not "directly related," all that means is that they would not be considered direct evidence of discrimination, which would shift the burden of proof to the employer. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Even if the statements which Plaintiff alleges were made were considered as "stray remarks" and could not be taken as direct evidence of discrimination, they may, however, "provide circumstantial evidence to support an inference of discrimination." *Grant v. Delco Oil, Inc.*, 259 B.R. 742, 751, n.3 (M.D. Fla. 2000) (quoting *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998)). Such evidence "may be critical for the jury's assessment of whether a given

employer was more likely than not to have acted from an unlawful motive." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3rd Cir. 1997).

Some courts have recognized the fallacy of an arbitrary rule forbidding consideration of such remarks.

> [The defendant] would have this court hold that discriminatory remarks are tied to the decisional process only if a decision maker said something to the effect of "I'm firing you because you are too old." Few employers who engage in illegal discrimination, however, express their discriminatory tendencies in such a direct fashion; ...

*EEOC v. Pape Lift Co.*, 115 F.3d 676, 684 (9th Cir. 1997).

The existence of a supervisor's discriminatory animus toward a protected class does not compel the conclusion that a disputed employment decision was motivated by that bias, but it assuredly would support such an inference. A contemporaneous statement of animus "directly related" to a disputed decision would be direct evidence of discrimination, and would shift to the employer the burden of proving that it would have taken the same action regardless of the petitioner's race. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). However, less conclusive evidence is sufficient to support, although it would not compel, a finding of discrimination.

In this case, the comments were made by George Stadler to Marc Silverberg and Michael Swartz. The comments were also made by George Stadler to Betty Ferguson, Jean Whitten, and Kimyatta Randall about Marc Silverberg. They were made within a year of firing Silverberg. These are not "stray remarks," but instead, relevant evidence of the animus that Stadler had against Jewish people like Marc Silverberg.

Defendant's argument against what it has characterized as "stray remarks" is not well-taken and should be rejected.

### III.     RETALIATION

Silverberg establishes a *prima facie* case of retaliation by showing:

(1)     that he engaged in activity protected by Title VII or Section 1981;

(2)     that an adverse employment action occurred; and

(3)     that there was a causal connection between the participation in the protected activity and the adverse employment decision.

*Kwong v. American Flood Research, Inc.*, 132 Fed.Appx. 18, 20 (5th Cir. 2005) (citing *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir. 1992).

### *1.     Protected Activity*

"Title VII prohibits retaliation in instances of either protected opposition or protected participation."  *Alack v. Beau Rivage Resorts, Inc.*, 286 F.Supp.2d 771, 774 (S.D. Miss. 2003).

Further,

Although **express complaints to supervisors about perceived discriminatory practices constitute protected activity**, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance .... Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. **The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner**.

*Id.*, at 775 (emphasis added).

In this case, Silverberg told his direct supervisor, Brett Borek, Assistant General Manager, that he was being discriminated against and harassed by George Stadler, Sam's Town's General

27

Manager.  Sam's Town admitted that it was aware of Silverberg's claims, in a time line produced by Angela Skinner, dated August 15, 2008, in which it said, "It has come through the grapevine that Marc is trying to build a case that George made comments about his Jewish heritage."  As such, Plaintiff has engaged in a protected activity that Sam's Town knew about.

### 2.      Adverse Employment Decision

On August 22, 2008, Silverberg was terminated.

### 3.      Causal Connection

"Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (*citing Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).  In *Hollis v. Johnson-Tombigbee Furniture Mfg. Co.*, 1994 LEXIS 21197, Civil Action No. 1:93CV346 (N.D. Miss., Dec. 21, 1994), Judge Davidson wrote, "This court agrees that the timing itself is suspicious, and this alone is minimally sufficient for the purposes of the motion at bar to establish his prima facie case as to his claim of reprisal discrimination."

Causal connection between employee's protected activity and adverse employment action may be proven, for purposes of Title VII retaliation claim, with circumstantial evidence that justifies inference of retaliatory motive, such as protected conduct closely followed in time by adverse action. *Brandau v. State of Kan.*, 968 F.Supp. 1416 (D. Kan. 1997).

28

The Fifth Circuit has recently reaffirmed this principle:

> Temporal proximity between Washburn's first Title VII suit and the alleged adverse employment actions only can prove the causation element of his *prima facie* case when the protected act and the adverse employment action are "very close" in time. *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that a three-month or four-month period may be close enough to make a *prima facie* showing of causation but holding that a twenty-month period was not).

*Washburn v. Harvey*, 2007 WL 2936307, *4 (5th Cir. 2007)

Further, "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Yerby v. University of Houston*, 2002 WL 31520240, *11 (S.D. Tex. 2002) (*citing Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). The Fifth Circuit has held that, "the 'causal link' required in prong three of the *prima facie* case for retaliation is not as stringent as the 'but for' standard." *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463 (5th Cir. 2002). In fact, "A plaintiff merely needs to show some connection between the protected activity and the adverse employment action in order to establish a *prima facie* case of retaliation." *Yerby*, at *12.

Over a year period, Silverberg had told Borek on several occasions about the discrimination and harassment. Approximately one week after Sam's Town was undisputably aware that Silverberg had complained about discrimination and harassment because of being Jewish, he was terminated.

In sum, Plaintiff has produced sufficient evidence of retaliation and Defendant's motion for summary judgment should be denied.

## IV. AFTER-ACQUIRED EVIDENCE

Defendant claims that it should be able to evoke this doctrine because it found out after the fact that Silverberg had taped conversations while he was still working at Sam's Town. However,

fatal to Defendant's argument, is that the rule it claims Silverberg violated is as follows:

> 48. Any us of a camera (including cellular phones) or recording devices while on duty **without authorization from a department manager**. Cellular phones may not be used while on duty, and if in possession must be in non-audio mode.

(See Exhibit R, attached to Defendant's Motion; emphasis added)

This is one of the "General Rules" that according to the Policy and Procedure Manual, "are various forms of prohibited conduct and may result in disciplinary action up to and including discharge." (*Id.*) In Bolender's untimely affidavit, she conveniently claims she would have fired Silverberg if she had known about the recordings.

The first problem with Defendant's argument is that Silverberg did not violate the policy. Silverberg was a director, which is a level up from department manager. If a department manager can authorize the use of a recording device, clearly a director can. Thus, Silverberg had the authority to authorize the recording and he did not violate the rule. Further, Silverberg had a cellular phone provided by Sam's Town with him at all times, which he was required to use on duty. Clearly, these prohibitions applied to persons below the department manager level and not above it. Further, Bolender's claim that she would have fired him merely creates a factual issue that should be determined by a jury, and not in a dispositive pretrial issue.

Plaintiff asks that Defendant's request to limit Plaintiff's damages under the After-Acquired Evidence rule be denied, or alternatively, that this Court reserve judgment on this issue until trial when the issue can be reviewed in contact, and with live testimony.

## CONCLUSION

For all the reasons stated herein, Plaintiff requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.


BY: */s/ Ron L. Woodruff*          
    JIM WAIDE
    MS BAR NO: 6857
    RON L. WOODRUFF
    MS BAR NO. 100391

WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE: 662-842-7324
FACSIMILE: 662-842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

    I, Ron L. Woodruff, attorney for Plaintiff, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court, utilizing the ECF system, which sent notification of such filing to the following:

Peyton S. Irby , Jr., Esq.
pirby@watkinsludlam.com
pcummins@watkinsludlam.com

Courtney L. Leyes, Esq.
cleyes@watkinsludlam.com
sdale@watkinsludlam.com

    THIS the 28th day of September, 2010.


               */s/ Ron L. Woodruff*      
                RON L. WOODRUFF